# FIRST MONDAY IN MAY, 1871.

## J. J. Coulson *v.* T. D. Harris.

1. COUNTY TAXES AND TAXES FOR THE SUPPORT OF THE POOR.—The act (Rev. Code, p. 210, art. 2) authorizing the board of police of the several counties to raise revenue for the support of the poor, and the act (Rev. Code, p. 416, art. 16) authorizing said board to raise revenue for general county purposes, are distinct and independent statutes, and the tax contemplated by the former may still be levied and collected, notwithstanding the power conferred by the latter may have been exhausted.

2. SPECIAL COUNTY TAXES.—The board of police levying a tax for special purposes need not, under Rev. Code, p. 417, art. 22, specify the particular special purposes for which the levy is made. It would, however, be more satisfactory that the order levying the tax should specify its objects.

3. LICENSES TO RETAIL SPIRITUOUS LIQUORS LIABLE TO TAXATION.—A license to retail vinous and spirituous liquors under the acts of 1857 and 1865, is a franchise; a franchise is property; and this species of property is liable to be taxed for county purposes, etc.

4. TAXATION—IMPAIRING THE OBLIGATIONS OF CONTRACTS.—The abandonment of the sovereign power of the state to impose taxes on property is never to be presumed. Nor is it ever to be assumed that the state has fettered itself in the exercise of this power in the future, except upon clear and irresistible engagement in the nature of a private contract, as distinguished from a mere act of general legislation. 35 N. Y. Rep., 633. The granting of a retail license is not such a contract in respect to the privilege of retailing liquor as shall be construed as an abandonment of any further power to tax such privilege.

5. Reed & Co. v. Beal, 42 Miss., 472, examined and overruled so far as relates to the power of counties to levy and collect taxes upon retail liquor licenses.

6. EQUITY JURISDICTION—INJUNCTIONS—REMEDIES.—It is no good ground for injunction that the tax collector is about collecting more money for taxes than has been assessed. Because, should he do so, the tax payer is not without remedy. He may recover it by action of *assumpsit.* (SIMRALL, J., Dissenting.)

7. Same.—To give equity jurisdiction in tax cases it must be averred in the bill, and shown by the facts that the tax collector is about to sell property unlawfully, and that such sale will result in irreparable injury to the complainant tax payer. (Simrall, J., Dissenting.)

8. Same.—In all cases involving simply the question of taxation, the issue is strictly one of common law, and equity can take no cognizance thereof.    (Simrall, J., Dissenting.)

9. Same.—If the assessment of a tax be illegal, it is void, the officer enforcing its collection is a trespasser, the purchaser of the property acquires no title, and the tax payer has, in general, a plain, full, complete and adequate remedy at law. "The absence of a plain and adequate remedy at law is the only test of equity jurisdiction." 5 Wall. 74.

10. Irreparable Injury.—A trespass is irreparable only when it will be impossible for a court of law to make full and complete reparation in damages, as for example, if the trespasser be insolvent. And that is one of the cases in which a court of equity will interpose its preventive power.

11. Parties—Practice.—Several distinct tax payers, having no united or common interest in the same property which is threatened with an illegal distraint for taxes will not be allowed to join in legal proceedings to prevent the collection of the tax. In such case the different tax payers have no such community of interest in the subject matter of the suit as would authorize them to sue together, or, as authorizes a few to sue for all. But each must sue separately for himself.

12. Same—Multiplicity of Suits.—The perpetration of several similar trespasses upon each of several distinct persons, thus laying the ground for each to bring a separate action against the same trespasser, is not such "a multiplicity of suits" as equity will interfere to prevent. There must be some joint or common interest of all in the same wrongful act which is about being committed.

Appeal from the chancery court of Rankin county. Watts, J.

The appellant assigned the following as error:    That the court below erred in sustaining the demurrer of the defend-. ant to complainant's bill.

*Geo. L. Potter*, for the appellant.

Appellant had been licensed by the board of police, to retail vinous and spiritous liquors, and had paid for such license, $350. The tax collector demanded from him $709 25, for his state and county taxes, on his business as a retail grocer for the year ending 14th May, 1866. It is alleged that in October, 1866, the board of police "without authority of law," levied a tax of 250 per cent. on the state tax, and the collector, claiming that the state tax, in addition to the license, is $200 on complainant's business, threatens to collect the whole sum of $709 25. The collective amount of the several levies is $700; the sum claimed, therefore, is $9 25 in excess of the true amount, even admitting the basis of the

claim to be right. The bill charges that the proceedings are illegal, and that the county levies are without authority of law. These charges, the demurrer admits to be true, and yet the strange order is made, sustaining the demurrer and dismissing the bill.

But this demand was illegal in other particulars. The board levied the taxes specified only on " property." These three percentages of tax are not to be taken as so much on the entire state taxes, but only so much on the state taxes on property. A man's business as a retailer, is not " property," as meant by the board in their order. It is clear that the demand of $450, being 225 per cent. on the state tax of $200 levied on the license, exceeds the order of the board and is excessive and illegal. Again, the demurrer admits not only the charge that the proceedings were illegal, but also, that the county levies are " without authority of law." It is said this levy was for a special purpose, but the record does not show for what purpose it was made.

The statute gives a special authority to levy, and confers but a limited jurisdiction; and the record ought to show that the authority was exercised within such limited jurisdiction. Phill. on Ev., Cowan & Hill's notes, part 2, p. 206, 207. For the authority authorizing these proceedings, see Acts 1865, p. 222; Rev. Code, 197, art. 3; ib., 197, 198, arts. 2, 3, 5, and 6. Now, when was the tax, under the act of 1865, to be levied? Was it for the year ending May 1, 1866? Certainly not. The second section of that act provides that the assessment under this act shall be made " in accordance with the laws now in force." p. 223. Upon a careful examination of these acts, it is clear that the first tax so assessed and collected under this act, was the tax for the fiscal year, 1867, and not for that of 1866, as attempted by the collector in this case.

Again: After being thus paid by the complainant for the privilege to retail, can the state tax the license evidencing the privilege? We say not; and the very nature of the transaction fully establishes this position. The sum paid for the license is called a tax; it is paid in advance as the price

of the privilege; and this tax is levied on the license which gives the privilege. The sum here claimed as a tax is not such in fact, but an arbitrary impost laid without regard to values. See Blackwell Tax Title, p. 3, *et seq.;* 5 Dana, 31; 9 Dana, 516; 4 N. H., 556; 6 Harris & Johnson, 382–3; 6 Barb., 209; 4 Comstock, 419; 2 Kent Com., 331. Also, 23 Miss., 459; 24 Miss., 386; ib., 497; 26 Miss., 474; 27 Miss., 209; 9 Wheaton, 773.

Upon petition for a re-argument in this case, the following additional authorities were cited : Licks v. the State, Opinion Book J, 241; Reed v. Beall, sheriff, Opinion Book J, 442–455; Rev. Code, 416, art. 16; ib., 417, art. 22; ib., 210, art. 2; Phil. Ev. (Cow. & Hill), part 2, 206–7; Rev. Code, 77, arts. 25, 26; ib., 79, art. 33; Acts of 1865, 224, art. 2; ib., 745, arts. 16, 17; ib., 417, 418, art. 24; ib., 198, art 6; ib., 206; and Orton v. Brown, 35 Miss., 427; Stetson v. Kemper, 13 Pick., 272; Baugs v. Snow, 1 Pick., 181; Dillingham v. Snow, 5 Pick., 547; Libby v. Burnham, 15 Pick., 144.

And upon the question of jurisdiction, counsel refered to, and commented on the following authorities : U. S. Bank v. the State, 12 S. & M., 456; Newman v. Elam, 26 Miss., 47; Newman v. Robertson, No. 5053; ib., No. 2427; same v. Peale, No. 2427; same v. same, No. 5068; Anderson v. the State, 23 Miss., 459; O'Donnell v. Bailey, 24 Miss., 387; Bailey v. Fuqua, ib., 497; Williams v. Cammack, 27 Miss., 209; Town of Ottawa, 21 Ill., 610; Varrone v. Davis, 27 Ga., 357–558; Miller v. Gorman, 38 Penn., 313; Commonwealth v. Supervisors, 29 Penn., 124; Burnett v. Cincinnati, 16 Ohio, 474; McArthur v. Kelly, 5 Ohio, 153, 154; Manley v. Raleigh, 4 Jones Eq., N. C., 870; Brown v. Marsh, 1 Foster, N. H., 81; Palmer v. Bowling, 8 Cal., 388; 9 Wheaton, 838. Also, Opinion Book K, 455.

*W. P. Harris,* for appellee.

There was no allegation in this bill, of any ground of equity, except that the tax is illegal and that the collector threatens to distrain for it. The case involves the validity of the tax on auctioneers, brokers, billiard tables, inns,

taverns, etc., etc., all of which subjects of taxation are expressly made liable to county taxes. Act of 1865, p. 225. The bill was demurred to in the court below, and the demurrer sustained for want of equity, and the bill dismissed. There is no equity on the face of the bill, even conceding that the tax is illegal. The bare allegation that the collector threatened to distrain for an illegal tax, amounts to no more than an averment that a sheriff threatens to levy an execution on a void judgment.

Courts of equity do not interfere to prevent a mere trespass, or illegal seizure of personal property, unless a recovery of damages would afford an adequate redress. The precise point as to injunctions to prevent the collection of an illegal tax, has been decided in numerous cases. Susquehannah Bank v. Supervisors, etc., 25 N. York R., 312, and cases there cited. Unless the interest sought to be recovered or effected, be an equitable interest, a fraud, accident, or trust appears, it must appear plainly from the bill, not only that the party is likely to be injured, but that there is no adequate remedy at law. But the proposition has no support in the constitution. There is an uncontrolled discretion in the legislature as to taxation, both as to the amounts and the subjects of taxation. 4 Wheat., 416; 35 N. York R., 629; 7 Ind., 576; also Sedgwick on Stat. & Cons. Law, 554.

Our constitution imposes no restriction on the power of the taxation. It is not even required to be equal or uniform; and there can be no doubt as to the power of the state to tax a license to pursue any kind of business. It belongs to the sovereign power, and the only remedy against excessive taxation is the ballot. It is objected that though this power belongs to the state, to tax everything, yet no such power has been delegated to the boards of police, and that the words persons and property, used in the article conferring the power to tax on boards of police, is a restriction, and does not comprehend all subjects of taxation which the state may reach under its unrestricted power. But the objection is without force. The two great divisions of the subject of

taxation are persons and property, and what is not a tax on persons must be a tax on property. The exclusive right to the use and enjoyment of a thing constitutes property, and this is all that can be said. The right to dispose of it is no test. A lease, without power of assignment, is property, so also, of exempted property. So a license to retail vinous and spirituous liquors, though its transfer is prohibited by law, is property. The tax on persons is a poll tax ; all other subjects of taxation come under the head of property ; and I think we may say, with entire accuracy, that all rights with respect to things of the world, may be justly denominated property. To constitute property there need be no tangible or visible thing ; and the legislature, in using the words, persons and property, clearly supposed that they included everything over which the power of taxation existed. But it is urged that the order of the board should have specified that the special tax was for the building or repairing of bridges, court-house, jail, etc. We do not think any one would question the sufficiency of the order if it had said a special tax for county purposes. Such being the description which the Code gives to the special tax for bridges, etc. Rev. Code, 418, art. 28, sec. 14 ; Ohio State R., 472.

Upon the re-argument of the case, counsel cited the following additional authorities : Moore v. Foote, 32 Miss., 469 ; Washington v. Pratt, 8 Wheat., 681 ; 13 Mass. R., 172 ; Clarke v. Strickland, 2 Curtis C. C. R., 439 ; Osborne v. U. S. Bank, 9 Wheat., 738 ; Wheeling Bridge v. Pa., 13 How., 567 ; Watson v. Sutherland ; 5 Wallace, 74 ; Hilliard on Injunctions, 385, and cases cited ; Rev. Code, 416, art. 16 ; ib., 418, art. 24 ; Rev. Code, 418, arts. 29, 30, and 32.

*Mayers & Lowry,* on same side.

Appellant filed his bill and enjoined the collection of the tax levied by the board of police of Rankin county, to which there was a demurrer, which was sustained, and the injunction dissolved, and bill dismissed. The main points in the bill are, 1st, that the board met on the third Monday in October instead of the second Monday, as required by the Code ;

and 2d, that his license gave appellant the right to retail, and the board had no power to levy any additional tax upon him.

1st. Art. 24, pp. 417 and 418, Rev. Code, requires the board to meet for the purpose of levying taxes, on the second Monday of October; but by the act entitled " an act to change the time of holding the police courts in the county of Rankin," approved Feb. 7th, 1860, see acts of regular November session 1859–60, page 312, the above article was repealed, and express authority given the board to meet on the third Monday.

2d. There is no limit on the power of taxation in the constitution. But on the contrary, express authority is given to the board of police to levy additional taxes on all state taxes and all subjects of taxation. See section 5, pages 222 and 225 of the act approved 5th December, 1865 (session of 1865), by which it will be seen that licenses are the subjects of taxation.

PEYTON, C. J. :

J. J. Coulson, on the 12th day of April, 1867, filed his bill of complaint in the chancery court of Rankin county, and obtained an injunction to restrain T. D. Harris as sheriff and tax collector of said county, from collecting the sum of $709 25 for state and county taxes, alleged to be due for the fiscal year ending on the 1st day of May, 1867.

The bill alleges that under the then existing law of the state, a license was duly granted to complainant by the board of police on the —— day of —— A. D. 18—, for the sum of $350, fixed by said board by authority of law, and paid by him, to retail vinous and spirituous liquors in the town of Brandon, in said county, and thereby he acquired a vested right to pursue such avocation and follow such business for twelve months from the date of said license, and that he cannot by any law, consistent with the provisions of the constitution, be required or compelled to pay any additional sum or sums of money for the privilege to do so.

The bill further alleges that since the grant of said license, the said board of police, on the 3d Monday of October, 1866, without authority of law, as complainant was informed and believes, levied a tax of two hundred and fifty per cent. on the state tax, and that the said Harris, defendant in the court below, as tax collector of said county, claims and insists that the state tax, in addition to the sum paid for said license, is two hundred dollars on complainant's business as aforesaid, and now threatens to collect the whole of said sum of seven hundred and nine dollars and twenty-five cents, and concludes with the prayer that upon the final hearing of the cause the injunction may be perpetuated.

The defendant demurred to the bill on the ground of the want of equity on the face of the bill. The motion was sustained by the court, and the bill dismissed. And from this decree, the complainant appeals to this court, and assigns for error the action of the court in sustaining the demurrer and dismissing the bill.

The order of the board of police assessing the tax alleged to be unauthorized by law, is in the following words: "Ordered by the board that the following be and the same is hereby levied on all the property in Rankin county, for the current fiscal year, and the sheriff is hereby required to collect the same, to-wit: One hundred per cent. on the state tax for county purposes; one hundred and twenty-five per cent. on the state tax for special purposes; and twenty-five per cent. on the state tax for poor fund."

The appellant obtained his license under a general law conferring on the boards of police power to grant license to any free white person, resident within their respective counties, and not within an incorporated city or town having a population of two thousand or more, to sell by retail, vinous and spirituous liquors in any quantity, within such county, and to assess and collect such tax thereon as such board may see proper, having reference to the situation of the place, as affording more or less profit to the applicant, and not exceed-

ing one thousand dollars, nor less than two hundred dollars, for a period of twelve months. Rev. Code, 197, art. 3.

The act to raise a revenue to defray the expenses of the state government, approved December the 5th, 1865, imposes a tax on each and every license granted under the provisions of law, to retail spirituous, vinous, or malt liquors by any board of county police, or by the corporate authorities of any city or town in this state, if within a city or town having a population of three thousand inhabitants, or more, the sum of five hundred dollars; if within a city, or town, having a population of two thousand, and less than three thousand inhabitants, the sum of three hundred dollars; if within a city or town having a population of over one thousand and less than two thousand inhabitants, the sum of two hundred dollars; and in all other places, the sum of one hundred dollars. Pamphlet acts of 1865, page 222. The fifth section of this act provides that all the subjects of taxation mentioned in it, shall be liable to all county taxes which shall be lawfully imposed by the boards of police, in addition to the taxes imposed by the act.

It is insisted by counsel for the appellant that the tax for the poor fund was included in the tax for county purposes, and that the twenty-five per cent. on the state tax for the poor fund was, therefore, improperly assessed. We cannot concur with counsel in this view of the law.

The act for the humane and benevolent purpose of relief and support of the poor, provides that the boards of police shall have power to assess and cause to be collected by the tax collectors, such tax as may be necessary for the support of the poor in their respective counties. Rev. Code, 210, art 2. This is a separate and distinct law from that which confers power on the boards of police to levy such taxes as may be necessary to meet the demands of their respective counties, upon such persons and property as are subject to state taxes for the time being, not exceeding the amount of the state tax. Rev. Code, 416, art. 16. It is manifest that the taxes to be raised under these acts are for distinct and

different purposes. The boards of police, in assessing taxes for the support of the poor, are not limited in their assessments to the amount of the state tax; but in assessing a tax for county purposes proper, the boards of police are limited in their assessments to the amount of the state tax. We, therefore, think that the taxes for the support of the poor, are not included in the taxes levied for county purposes, and that the assessment of twenty-five per cent. on the state tax, to raise a fund for the beneficent purpose of sustaining the poor, is authorized by law.

It is also objected that the levy of one hundred and twenty-five per cent. on the state tax is illegal, because it does not specify the purposes for which the tax was levied. This objection, it is believed, is not well taken. There is but one special tax, which the board of police is authorized by law to levy, and that law specifies the purposes for which that tax is to be levied. Rev. Code, 417, art. 22. The tax-payers can readily ascertain the legality or illegality of the tax by comparing the order of assessment with the law, and when thus viewed in connection they will at once see the specific purposes for which the tax was laid. *Id certum est quod certum reddi potest.* They are presumed to know the law, and therefore to have knowledge of the objects to which the tax is to be applied. It must be conceded, however, that it would have been more satisfactory, had the order assessing the tax specified the purposes for which it was imposed, yet the failure to do so, does not, in our opinion, vitiate the order, and therefore, we think the tax was legally and properly assessed.

The payment of the tax in this case is further resisted on two other grounds: 1st. That the license to retail vinous and spirituous liquors is not liable to taxation; 2d. That the law imposing such tax is unconstitutional as impairing the obligation of a contract, and therefore null and void.

The first of these grounds of objection raises the question, whether the license, granted to the appellant to retail vinous and spirituous liquors, is property. The license is a franchise,

and a franchise is recognized by the best authority as property, and is, therefore, the subject of taxation. Armington v. Barnet, 15 Vt., 745. There are many persons who pay for license to pursue a certain business, the income of which is taxed. Such is the case with the keepers of inns and taverns, hawkers and peddlers and others, who pay for license to follow their respective occupations, and afterward pay a tax upon the gross receipts of their business or income, or upon the gross amount of their sales, and no good reason can be assigned why the retail dealer in vinous and spirituous liquors should be exempt from the operation of such laws. The difficulty of ascertaining, with any degree of certainty, the extent of his business, no doubt, induced the legislature to tax the license instead of the gross amount of his sales under it. The principle, however, is the same, whether the tax be on the license or on the proceeds of the business done under its authority.

This brings us to the consideration of the second question: Was the license to retail, a contract within the meaning of the federal and state constitutions, prohibiting the legislature from passing any law impairing the obligation of contracts?

Taxation is an exercise of sovereign power, which has been entrusted by the people, to the legislative department of the government. The legislature imposes a tax upon the people of the state, for the support of the state government. And, for the more perfect and convenient government, the state is divided into certain political divisions, called counties, parishes, and districts. These are *quasi* corporations, and are to be distinguished from those designated as municipal corporations. The former class of public political corporations, are established without any express charter or act of incorporation, with limited powers, and restrained from a general use of authority, whilst municipal corporations, such as cities and towns, are created by express charter or act of incorporation. These counties and municipal corporations are organizations, to which the state, through its legislature, delegates a portion of its sovereign power, to be exercised within their

prescribed geographical limits, to aid the state in the administration of the laws, and thus to fulfill the compact lying at the foundation of a free government, to-wit: The obligation of the state to protect its citizens in the possession and enjoyment of their fundamental rights of personal security, personal liberty, and private property. They are the people of the state, inhabiting particular divisions of territory and localities, to whom the powers of local government have been granted, to be exercised for the good government of these respective localities, to preserve order and obedience to the law, and to ameliorate and improve their condition, and subserve their convenience as communities. Taxation exacts money from individuals, as their share of a public burthen, and the tax-payer receives, or is supposed to receive, just compensation in the protection which the government affords to his life, liberty, and property, and in the proper application of the tax.

As a general rule, the taxing power has been treated by the judiciary as vested in the absolute discretion of the legislative bodies. This doctrine has been repeatedly declared both by the state and federal tribunals. The power of taxation is essentially a power of sovereignty, and necessary to the very existence of government. The relinquishment of such a power is never to be assumed. The state may, upon a sufficient consideration, partially relinquish it, but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear.

The power of legislation, and consequently of taxation, operates on all persons and property belonging to the body politic. This is an original principle, which has its foundation in society itself. It is granted by all for the benefit of of all. It resides in government as part of itself, and need not be reserved when property of any description, or right to use it in any manner, is granted to individuals or corporate bodies. However absolute the right of an individual

may be, it is still in the nature of that right that it must bear a portion of the public burthens; and that portion must be determined by the legislature. This vital power may be abused by unwise legislation; but the constitution was not intended to furnish the correction for every abuse of power which may be committed by the government. The interest, wisdom and justice of the representative body, and its relations with its constituents, furnish the only security where there is no express contract against unjust and excessive taxation, as well as against unwise legislation. All persons and property, over which the sovereign power of a state extends, are subject to taxation. The sovereignty of a state extends to everything which exists by its own authority, or is introduced by its permission. Providence Bank v. Billings, 4 Peters, 514. If the legislature have a right of taxation over any given property or subject, that power is unlimited and uncontrollable. Herrick v. Randolph, 13 Vermont, 629.

It is never to be assumed that the state has fettered its power, in the future, except upon clear and irresistible evidence that the engagement was in the nature of a private contract, as distinguished from a mere act of general legislation; and that such, in the particular instance, was the actual and deliberate intention of the legislature. The People v. Roper, 35 New York, 633.

It is true that the state may, if it will, within the limits prescribed in its organic law, enter into private contracts with its citizens, by which the people and the government shall be bound; but we are never to construe a general statute as embracing such a purpose. When it is obvious that it was designed only as an expression of the legislative will, for the time being, in a matter of mere municipal regulation, when this is the object of the law, those who act upon the faith of its provisions, do so with a reasonable assurance indeed that there will be no further legislation upon the subject, affecting their interest, until such action shall be required, in the judgment of the legislature, by the general

interest of the community; but with notice that such general municipal regulation is subject to future legislation, whenever the public exigences may demand it, such subsequent legislation involves no breach of obligation, in the sense of the constitution. For the faith reposed is on the stability of a general law, and not on the efficacy of a legal contract.

There is no intendment in favor of the abdication by the people, of the general and inherent authority to impose taxes on every citizen. They sanctioned no such relinquishment by their agents, either in the state or federal constitution, and these are the only authentic acts, in which to seek a warrant for the surrender of sovereign powers, essential to the state and national existence.

The license in this case having been obtained under a general law, is not a contract in the meaning of the provision of the constitution, which prohibits the legislature from passing a law impairing the obligation of contracts. We, therefore, have arrived at the conclusion that the act, under which the tax in controversy was levied, neither impaired any contract nor divested any vested rights of the appellant.

The counsel for the appellant has cited the case of Licks v. the State, 42 Miss., 316, to sustain his position that the tax is illegal for the want of authority in the board of police to levy it. There is no state of facts in this case to which the decision in that case can apply. It is not charged in the bill, nor is there any evidence in the record, to show that the town of Brandon had not granted license to the appellant to retail vinous and spirituous liquors within its corporate limits. That question was not raised by the bill of complaint, which expressly alleges that under the existing laws of the State of Mississippi a license was duly granted by the board of police of said Rankin county, for which the sum of three hundred and fifty dollars, fixed by the said board of police by authority of law, was paid by complainant, by virtue of which he had a vested right to retail vinous and spirituous liquors for

the period of twelve months from the date of his license, and that he cannot, by any law, consistent with the provisions of the constitution, be required or compelled to pay any additional sum or sums of money for the privilege so to do. Hence it will be seen that the authority of the board of police to grant the license sought to be taxed, is clearly admitted, and is, therefore, not an element in the case made by the bill.

But we are referred by counsel, to the case of Reed v. Beal, 42 Miss., 472, as furnishing the rule of construction of the statute, under which the levy of the tax in the case under consideration was made. That case, in its main features, is like the present, and if the construction of the statute in that case can be sustained, it must govern this case. The bill alleges that on the 4th day of September, 1865, the appellants, Reed & Co., obtained a license from the board of police of Tishomingo county, to retail vinous and spirituous liquors in the town of Corinth, in said county, for the term of twelve months, for which they paid two hundred and two dollars; that on the 5th day of December, 1865, the legislature passed a revenue act by which they levied a tax of one hundred dollars upon every license so granted in every incorporated town in the state of less population than one thousand inhabitants, as had the town of Corinth at that time; that the 5th section of said act provides that all the subjects of taxation in said act mentioned shall be liable to all county taxes which shall be lawfully imposed by the boards of police, in addition to the taxes imposed by this act.

That on the 10th day of October, 1866, the board of police, under said act, levied an additional tax of one hundred and fifty per cent. upon the state tax upon appellant's license; to restrain the collection of which, an injunction was obtained. The tax collector, the defendant below, demurred to the bill, and the demurrer was sustained by the court, which dissolved the injunction and dismissed the bill.

Upon appeal, our predecessors perpetuated the injunction as to the county tax, and dissolved it as to the state tax, on

the ground that the county of Tishomingo exhausted its power of taxation upon the license, when the board of police granted it to the appellant.

We cannot comprehend the force of this reasoning; for it appears that the license was granted on the 5th day of September, 1865, and the power to tax it was not delegated to the county until the 5th day of December following; and if the power of taxation, on the part of the county, was exhausted by the grant of the license, that power, according to the reasoning of the learned judge who delivered the opinion of the court in that case, must have been exhausted some three months before it existed. There is no such thing as exhausting the power of taxation. It is vested in the absolute discretion of the legislature. The power of taxation, as before remarked, is essentially a power of sovereignty, and necessary to the very existence of government. The act of December, 1865, imposing the state tax, and giving power to the county to tax, also, contemplates an existing license, upon which the state tax attaches, and upon which the counties are authorized to levy a tax to the extent allowed by law. And the money for the license having been paid into the county treasury, does not at all affect the power of the county to tax the license, if the legislature, in its wisdom, thought proper to make it the subject of taxation. The existence of the license pre-supposes that the money paid therefor, has gone into the county treasury, because this is made by law a prerequisite to the issuance thereof. Even if the money paid for the license is to be regarded as a tax, it can have no influence upon the taxing power. It is certainly competent for the legislature either to increase or diminish the taxes, as that department of the government may, in its discretion, think proper. The legislature had, undoubtedly, the power to impose the tax upon the license, and it delegated that power to the county, by virtue of which the board of police is fully authorized to levy a tax upon the same subject of taxation, to the extent permitted by law, and we can perceive no good reason why the county tax should not be

enforced as well as the state tax.  Suppose the law required
that the money paid for license to retail vinous and spirituous
liquors, should be paid into the state treasury, would any one
contend that that fact would paralyze the arm of the taxing
power of the state?  Certainly not.  Why should it have
that effect when paid into the county treasury?  There is no
reason for the distinction.  If the state had the right to tax
the license, the board of police received the same right and
power from the state, by the fifth section of the act of the
legislature, approved December 5th, 1865.  We have arrived
at the conclusion that the disposition of the money paid for
the license, could not, in any way, affect the right of the
state or county, to the taxes respectively imposed by them
upon the license, and that each of them had an equal right
to enforce the collection of the same.  We cannot, therefore,
concur with our predecessors in the construction which they
have given to the above mentioned statute, in the case of
Reed & Co. v. Beal, so far as relates to the power and right
of the county to levy and collect the tax upon license to
retail vinous and spirituous liquors.

It is contended that the bill shows that the tax collector
claims a right to collect nine dollars and twenty-five cents
more than the amount of the taxes assessed, and that the
injunction should have been perpetuated to that extent at
least.  The tax collector has no right to collect more than the
amount of the taxes, but should he do so, the tax payer is not
without remedy.  He may recover it back in an action of
*assumpsit* for money had and received to his use.  It is true
that the bill in the case under consideration, alleges that the
tax collector threatens to seize and sell the property of com-
plainant, for the payment of the taxes for the fiscal year
ending on the first day of May, 1866.  But this is shown to
be a mere mistake of the draughtsman of the bill, by other
averments and allegations therein.  The bill states that the
board of police, on the third Monday of October, 1866, levied
the tax complained of, and the collection of which has been
enjoined in this case, and sets out the order of the board levying

the tax, which expressly declares that said taxes are levied for the current fiscal year, which can be no other than the fiscal year ending on the first day of May, 1867. The taxes which have been enjoined, were levied at a time authorized for the meeting of the board of police of Rankin county. The whole scope and tenor of the bill clearly shows that the taxes sought to be enjoined, and which were, in fact, enjoined, were the taxes levied for the fiscal year ending on the first day of May, 1867.

It is insisted by the counsel for the appellee, that the chancery court had no jurisdiction in this case. This raises a question, which, it is believed, has never been directly adjudicated by this court. We have been referred by counsel for the appellant, to several tax cases which have been before our predecessors, in which the important question of equity jurisdiction was passed *sub silentio*, both by the counsel and the court, and the cases tried upon their merits. Even consent of parties cannot give the court jurisdiction of the subject matter of the suit. This is an open question in this state, which has never been before presented by counsel, and consequently not decided by the courts of this state. Being thus unfettered by precedent, we will proceed to the consideration of the question which we are called upon to decide.

Writs of injunction may be issued in cases of equity jurisdiction, and when specially authorized by statute. And to give equity jurisdiction in tax cases, it must be averred in the bill, and shown by the facts set out therein, that a sale would be an irreparable injury to the complainant tax-payer. Courts of equity ought not, except upon the clearest grounds, to interfere with the speedy collection of public taxes. That a writ of injunction can only be issued, where the complainant, in his bill, makes a case of equity jurisdiction; and in all cases, involving simply the question of taxation; the issue is strictly one of common law, and courts of equity can take no cognizance thereof; that a party aggrieved by an illegal taxation, has ample remedy at law, and need not, in any case,

have recourse to a court of equity, unless the facts bring the
case within some appropriate recognized head of equity
jurisdiction, such as to prevent irreparable injury, to protect
a party in the enjoyment of an exclusive franchise or privi-
lege, or to prevent a continuing trespass or injury, or other
wrong, for which there would be no adequate remedy at law.
Styles v. Griffith, 3 Yates, 82.

We are referred by counsel for appellant, to the cases of
.Osborn et al. v. the Bank of the United States, 9 Wheat.,
738–838, and Dodge v. Woolsey, 18 Howard U. S. Rep., 339,
as sustaining the jurisdiction of equity in such cases, where
the bill charges the tax to be illegal and void. Neither of
these cases, it is believed, sustain that position.

In the first of these cases, there was an attempt, on the
part of the state of Ohio, by hostile legislation in the shape
of an excessive tax, to destroy the rights and privileges of
that institution within the limits of that state, and thereby
to drive it out of the state. Chief Justice Marshall, in deliv-
ering the opinion of the court in that case, says : " The
question is reduced to the single inquiry, whether the case is
cognizable in a court of equity. The appellants allege that
the original bill contains no allegation which can justify the
application for an injunction, and treat the declarations of
Ralph Osborn, the auditor, that he should execute the law, as
the light and frivolous threats of an individual, that he would
commit an ordinary trespass. But surely this is not the point
of view in which the application for an injunction is to be
considered. The legislature of Ohio had passed a law for
the avowed purpose of expelling the bank from the state,
and had made it the duty of the auditor to execute it as a
ministerial officer. He had declared that he would perform
his duty. The law, if executed, would unquestionably effect
its object, and would deprive the bank of its chartered privi-
leges, so far as they were to be exercised in that state. It
must expel the bank from the state ; and this is a conclusion
which the court might rightfully draw .from the law itself.
That the declarations of the auditor would be fulfilled, did

not admit of a reasonable doubt. It was to be expected that a person continuing to hold an office, would perform a duty enjoined by his government, which was completely within his power. This duty to be repeated until the bank should abandon the exercise of its chartered rights.

" To treat this as a common casual trespass, would be to disregard entirely its true and substantial merits. The application to the court was, to interpose its writ of injunction, to protect the bank, not from the casual trespass of an individual, who might not perform the act threatened, but from the total destruction of its franchise, its chartered privileges, so far as respected the state of Ohio. It was morally certain that the auditor would proceed to execute the law, and it was morally certain that the effect must be the expulsion of the bank from the State. An annual charge of $100,000 would more than absorb all the advantages of the privilege, and consequently annul it."

The interference of the court of chancery in this class of cases, has most frequently been to restrain a person from violating an exclusive privilege, by participating in it. And this equitable interposition is for the purpose of preventing an injury being done to the party entitled to the franchise or privilege which cannot be estimated in damages. The injury done by denying the bank the exercise of its franchise in the state of Ohio, is as difficult to calculate as the injury done by participating in an exclusive privilege. The single act of levying the tax in the first instance, is the cause of an action at law; but that affords a remedy only for the single act, and is not equal to the remedy in chancery, which prevents its repetition, and protects the privilege.

From this it will be seen that the court sustains the jurisdiction of equity upon the two grounds of an irreparable injury and destruction of the franchise of banking in the state of Ohio. Either of which, upon well settled principles, would justify a resort to the restraining power of a court of equity. The court admitted in that case that the single act

of levying a tax in the first instance, is the cause of an action at law, and equity assumes jurisdiction only to prevent an irreparable injury and destruction of the franchise in that state. This shows that the single act of levying an illegal tax is to be redressed in a court of law, and a court equity cannot properly be invoked by the tax-payer, unless there are threats to repeat the levy and collection of the tax from him, and then equity interposes only upon the ground of a continuing injury or mischief.

The second case above referred to by appellant, does not sustain the position taken by his counsel, and the jurisdiction of the chancery court may well be supported on the ground of an irreparable injury. For it appears that the Commercial Bank of Cleveland had paid an illegal tax for the year 1852, and that the tax collector was proceeding to collect from the bank a similar tax for the year 1853, when Woolsey, one of the stockholders in said bank obtained an injunction restraining Dodge, the tax collector, from collecting the tax, which was illegal, and there was danger of irreparable mischief to the franchise of the bank from a repetition of the tax, and the injunction was necessary for the protection of the moneys and choses in action of the bank from sale and alienation under the tax proceedings. These are ample grounds for the interposition of equity in that case ; the force of which, however, as an authority, is much weakened by the dissent of three of the judges from the opinion of the majority of the court in that case.

In the case of Pennsylvania v. the Wheeling Bridge Co., 13 How., 567, the jurisdiction of chancery was sustained on the ground that the bridge was a nuisance.

The jurisdiction of equity to grant relief by injunction against a nuisance, whether public or private, is founded on the right to restrain the exercise or the erection of that from which irreparable damage to individuals, or great public injury would ensue. It is laid down in the books that every trespass is not a foundation for an injunction, when it is con-

tingent and temporary.  But if it continues so long as to become a nuisance, the court of chancery will interfere. Drewry on Injunctions, 237.

In the case above referred to of the Wheeling Bridge, the court say : That " to justify the interference of courts of equity in cases of nuisance, by way of injunction, there must be such an injury, as from its nature, is not susceptible of being adequately compensated by damages at law, or such, as from its continuance or permanent mischief, must occasion a constantly recurring grievance, which cannot otherwise be prevented than by injunction.  Relief in this form is given, as it cannot be given adequately in any other.  The injury complained of in the language of the books, must be irreparable by a suit at law for damages.  That if the bridge be such an obstruction to the navigation of the Ohio river as to change, to any considerable extent, the line of transportation through Pennsylvania to the northern route through New York, or to a more southern route, an injury is done to the State of Pennsylvania, as the principal proprietor of the lines of communication, by canal and railroad from Philadelphia to Pittsburg.  And this injury is of a character for which an action at law could afford no adequate redress.  It is of daily occurrence, and from the nature of the wrong, the compensation could not be measured or ascertained with any degree of precision.  If the obstruction complained of be an injury, it would be difficult to state a stronger case for the extraordinary interposition of a court of chancery.  In no case could a remedy be more hopeless by an action at common law."  662.

In the same case the court further say : " That the United States having no common law, an indictment at common law could not be sustained in the federal courts by the United States against the bridge as a nuisance, as no such procedure has been authorized by congress.  But a proceeding, on the ground of a private and an irreparable injury, may be sustained against it by an individual or a corporation. The injury makes the obstruction a private nuisance to the

injured party; and the doctrine of nuisance applies to the case where the jurisdiction is made out, the same as a public prosecution. If the obstruction be unlawful, and the injury irreparable by a suit at law, the injured party may claim the extraordinary protection of a court of chancery." 564. In that case the bridge was declared to be a nuisance, and a material obstruction to the navigation and commerce on the river. On this point the court say there is no doubt. And a jury in such a case could give no aid to the court, nor security to the parties. 13 How., 568.

In the case of Georgetown v. the Alexandria Co., 12 Peters, 98, the court remarked, that a court of equity, also, pursuing the analogy of the law, that a party may maintain a private action for special damage, even in case of a public nuisance, at the instance of a private person, where he is in imminent danger of suffering a special injury, for which, under the circumstances of the case, the law would not afford an adequate remedy.

The trustees of the city of Louisville having, by their by-law, laid a tax of one hundred dollars on each billiard table in said city, Gwathmey & Gretsinger, who had a billiard table in said city, filed their bill in chancery for an injunction to restrain the trustees from the collection of the tax, on the ground that they had, in levying such tax, transcended their authority. To this bill, the trustees demurred, but their demurrer was overruled; and on a final hearing, the court decreed a perpetual injunction. From which decree the trustees carried the case to the court of appeals. And that court in delivering their opinion, say: " There is obviously no ground for the interposition of a court of equity in this case. If the trustees had authority to levy the tax, they might, no doubt, rightfully collect it; and if they had no such authority, and should attempt to coerce the payment of the tax by distress, they would be guilty of a wrong, for which a court of law would afford an adequate remedy. It is true that a court of equity will sometimes interpose to prevent a wrong, but it is done in general only where the

wrong is in its nature irreparable in the modes of redress afforded by courts of common law; and that cannot be said to be the case in relation to the supposed wrong which is apprehended by the complainants." The trustees of Louisville v. Gwathmey & Gretsinger, 1 A. K. Marshall, 412.

If the assessment of a tax be in violation of law, it is a void act; the collector, in enforcing its collection, is a trespasser, and the purchaser acquires no title at the sale, and in general, the tax-payer has a plain, full, adequate and complete remedy at law. In the case of Marr v. Enlow, 1 Yerger, 452, an action of trover was brought against the tax collector for personal property, which he had seized for the purpose of enforcing the collection of a tax which had been illegally assessed. The supreme court of Tennessee held that the action would lie. And the same doctrine was maintained in the case of the county court of Obion v. Marr, 8 Humphrey, 634; Blackwell on Tax Titles, 156.

In the case of Watson et al. v. Sutherland, 5 Wallace, 74, Watson & Co. having issued writs of *fieri facias* on certain judgments which they had recovered in the circuit court for the district of Maryland against Wroth and Fullerton, caused them to be levied on the entire stock in trade of a retail dry goods store in Baltimore in the possession of Sutherland, who, claiming the exclusive ownership of the property, and insisting that Wroth and Fullerton had no interest in it, filed a bill in equity to enjoin the further prosecution of these executions, and so to prevent, as he alleged, irreparable injury to himself. The supreme court of the United States, in affirming the decree of the court below perpetuating the injunction, say that legal compensation refers solely to the injury done to the property taken, and not to any collateral or consequential damages resulting to the owner by the trespass. Loss of trade, destruction of credit and failure of business prospects are collateral or consequential damages, which, it is claimed, would result from the trespass, and for which compensation cannot be awarded in a trial at law. Commercial ruin to Sutherland, might, therefore, be the effect of closing

his store and selling his goods, and yet the common law fails to reach the mischief. To prevent a consequence like this, a court of equity steps in and arrests the proceedings *in limine;* brings the parties before it; hears their allegations and proofs; and decrees, either that the proceedings shall be unrestrained, or else perpetually enjoined." The court then lay down as the only true rule upon the question under consideration, that " the absence of a plain and adequate remedy at law affords the *only test* of equity jurisdiction."

When it is impossible for the plaintiff to prove fully his damages at law, the injunction will be allowed. The irreparability of the injury is a conclusion which the law draws from the character of the trespass—the character of the trespass being exhibited in a statement of the facts which constitute it, and from those facts the court are to determine whether it is irreparable. A trespass is irreparable when from its nature, it is impossible for a court of law to make full and complete reparation in damages. And that is one of the cases in which equity will interpose its preventive power. It is well understood that equity will not interfere in a case of a mere single trespass. As a general rule, it leaves the party to his legal remedy. But if there is anything special in the case, anything which renders the remedy at law impossible or incomplete, as for example, when the trespasser is insolvent, or when from its nature, it is impossible to prove the damages which grow out of the trespass— in such case, chancery will put forth its restraining hand, and compel the wrong-doer to desist. Justices of Pike County v. Griffin et al., 11 Ga., 246 ; Bolster v. Catterlin, 10 Ind., 117; and Pitt v. Cosby, 5 Jones' Equity, N. C., 254.

Story, in his invaluable treatise on Equity Jurisprudence, says: " Courts of equity interfere in cases of trespass to prevent irreparable mischief, or to suppress multiplicity of suits and oppressive litigation. For if the trespass be fugitive and temporary, and adequate compensation can be had, in an action at law, there is no ground to justify the interposition of courts of equity." 2 Story's Equity, § 928.

In the case at bar, we do not see that any of the circumstances exist which would authorize the action of a court of equity. There is no proof of the insolvency of the tax collector and his sureties, nor is there any allegation of that kind in the bill, or that there is any *pretium affectionis* or peculiar value attached to the property sought to be subjected to the payment of the tax which could not be arrived at in an action at law. The claim is a single and isolated one, for a specific and definite sum, not dependent on or connected with any other claim presented by any other individual, and involving no oppressive litigation in seeking redress. It is not a case in which it is necessary that a court of chancery should interfere to prevent a multiplicity of suits. The mischief, therefore, in legal contemplation is not extraordinary or irreparable.

It is an elementary rule in chancery pleading, that every person, who is at all interested in the event of a suit or necessary to the relief sought, must be made a party in order to enable the court to settle the rights of all, and make a complete and final decree upon the merits. This rule was dispensed with where it was inconvenient, difficult or impracticable, on account of the number and situation of the parties, to unite them in one suit. In that case, the court went as far as it could, in doing justice to parties before it, rather than deny it altogether. The true distinction is between the cases where the parties have a common right or general interest in the subject of controversy; and cases where they have distinct and several interests only, and no common right or claim, the general rule is, that all parties interested in the subject of the suit, shall be parties to the record. To this rule there are certain exceptions. All those exceptions, so far as this particular point is concerned, may be divided into two classes: one class is where several persons, having distinct rights against a common fund, or against one individual, are allowed, a few of them on behalf of themselves and the rest, to file a bill for the purpose of prosecuting their mutual rights against the common fund, or the individual liable to their demand.

The other is where a person may have a right against several individuals who are liable to common obligations. In that case, a bill is allowed to be filed by a single plaintiff against some, but not all of those persons, who are bound to make good the plaintiff's demand. Story's Equity Pleading, 124, § 121. But we do not understand that the case under consideration comes within either of these exceptions. There is no general or common interest affected by the assessment and tax in this case. The property is owned in severalty, and each tax-payer may sue alone, and obtain complete relief so far as his rights and property are concerned. There is no necessity for one tax payer to unite another with him in a suit for this purpose. Suppose the tax collector had levied upon and sold the personal property of each tax payer, and thus collected the amount of tax against each, could it be claimed with any propriety that all whose property had been illegally sold, could maintain a joint action of trespass? Certainly not. It must be admitted that there was no joint and common interest in the property, and that each one had his separate trespass to complain of. The rights are separate, and the interests entirely distinct; and one tax-payer may obtain complete relief without making another a party. And it has been repeatedly decided, and as it is believed upon correct principles, that an action brought by a party suing in his own behalf, as well as in behalf of other persons, interested, to restrain the collection of a tax imposed upon the separate property of the plaintiff and such other persons, could not be maintained. Bouton v. City of Brooklyn, 15 Barbour, 375; Newcomb v. Horton, 18 Wisconsin, 569; Messick v. the Board of Supervisors of Columbia County, 50 Barbour, 190; and Dodd et al. v. the city of Hartford, 25 Conn., 232.

In the case of McCoy v. Chillicothe, 3 Ohio Rep., 370, the tax-payer sought the aid of a court of chancery to restrain the collection of a tax, on the ground that the law, in pursuance of which the tax was levied, was unconstitutional and void; and it was insisted that equity should entertain juris-

diction to prevent a multiplicity of suits and oppressive liti-
gation.   The supreme court of Ohio held that the case did
not come within the jurisdiction of chancery, the complain-
ant having ample remedy at law.   The separate repetition of
trespasses, laying a ground for separate suits between the
same parties, is not that description of multiplicity of suits,
which induces equity to interfere.   And this doctrine is sus-
tained and confirmed by the subsequent case of the Mechan-
ics and Traders Bank v. Debolt, 1 Ohio State Rep., 591.

In the case above referred to, of Dodd et al. v. City of
Hartford, a bill in chancery was filed by James Dodd and
thirty-two others in behalf of themselves and certain other
persons named in a schedule annexed to the bill, against the
mayor, aldermen, common council and freemen of the city of
Hartford, praying for an injunction to restrain the defendants
from the collection of a tax alleged to be illegal and void.
The bill alleged that the mayor had issued a warrant of distress
against the goods and chattels of the plaintiffs, which had
been levied on the property of the said Dodd, who had com-
menced an action of trespass against the said mayor and col-
lector of said city, and that unless the court should interfere
by injunction, the complainants other than said Dodd, and
the several persons to the number of three hundred and
upward, named in said warrant, would be compelled to com-
mence and prosecute like actions at law, in separate suits for
like seizure of their property, for the purpose of enforcing
the payment of said tax.   That said actions would cause
great expense and vexation, and greatly disturb the peace of
the community.   Upon a demurrer to the bill the supreme
court of Connecticut held that the chancery court had no
jurisdiction to interfere by way of injunction, on the ground
that no property, right or franchise held by complainants in
common, is claimed to be affected by the proceedings of the
city.   The assessments were against the complainants sever-
ally—not against them jointly.   If the taxes are collected,
and any of these parties have occasion to bring suits at law,
their suits must be several and separate.   They cannot join

in an action at law against the city or against the tax collector.

In respect to each of these complainants, taking his case separately, it is difficult, say the court, to see why he has not adequate remedy at law. No irreparable injury can arise from the levy. If the proceedings of the common council are irregular and void, as the complainants claim they are, an action at law will lie to recover all the damages, which shall be sustained by the levy, and the question of the legality of the assessment will then be tried in its *appropriate forum*—a court of law.

It was insisted on the part of the complainants that the court ought to entertain jurisdiction in order to prevent a multiplicity of suits. But no one of these complainants has any interest in the suit which another one of them may think proper to institute. They cannot individually complain that others are compelled to sue, for they have no share in the expense or vexation of each other's suits. The multiplicity of suits which the bill seeks to avoid, does not affect injuriously any of the complainants. No one of them has occasion to expect any such multiplicity affecting himself. One suit is all that any one of them has to fear. The court say in conclusion that " the bill does not present a case of such irreparable injury or of inadequate relief at law, as to warrant the interposition of a court of equity. And, that reasons of public policy, founded on the necessity of a speedy collection of taxes, ought to prevent a court of chancery from suspending these proceedings, except upon the clearest grounds." The same court decided in the case of Hine v. Stephens, 33 Conn., 497, that an injunction ought not to be granted, except for the prevention of great and irreparable mischief.

The true and well settled doctrine was announced by the vice-chancellor, in the case of Gartin v. Asplin, 1 Madd. Ch. Rep., 150, that where there is a full, adequate, and complete remedy at law, a court of equity will not assume jurisdiction. In that case the complainants sought to restrain the sheriff

from executing a *fire facias* against the furniture and effects of the defendant, which, with a house, had been let by him to the plaintiff, who was in possession. Upon an application for an injunction, the vice-chancellor said " the sheriff has no right to seize. If he does seize, it may be very injurious to the plaintiff, and it is to be regretted; but this court cannot interfere, when there is a remedy at law. The right to take in execution is a question of law. Injunctions would be applied for every day, when executions are improperly issued, if the court were to assume a jurisdiction in such cases. There is no instance of stopping a proceeding at law, under such circumstances."

The assessment roll as returned by the assessor into the probate clerk's office, when corrected, and the order of the board of police assessing the taxes for the county, are the collector's guide and his warrant of distress. Nalle v. Funwick, 4 Randolph, 593, and Moore v. Foote, 32 Miss., 469. If a court of equity will not restrain an illegal sale under an execution upon a judgment at law, it is difficult to perceive upon what principle it can restrain a sale for taxes under a warrant of distress. Both are proceedings at law, and unless they are taken out of the general rule, by special circumstances, a court of equity has no right to interfere in either case. And certainly upon principle, it has no more right to to interfere in the one case than the other.

The supreme court of Michigan state the true rule of equity jurisdiction to be, that when the subject of the suit is embraced under any of the appropriate heads of equity jurisdiction, that court will take cognizance of it. And in that state, a court of equity will not grant an injunction to restrain the tax collector from collecting a tax, by seizure and sale of the complainant's property, on the ground of the want of jurisdiction. Williams v. Mayor of Detroit, 2 Michigan Rep., 560 and 585. And it is held by the court as the last resort in the state of Kansas, that a court of chancery has no power to grant an injunction to restrain the collection of an illegal tax, on the ground that the remedy

at law, was full, adequate, and complete. Burns et al. v. Mayor and City Council of Atchison et al., 2 Kansas, 454.

The supreme court of Missouri have repeatedly decided that an injunction will not be granted at the instance of a tax-payer, to restrain the levying of taxes, upon the ground that the county court had no authority to make the levy, and that its action was a nullity. That to justify such interposition, it must appear that the injury to the tax-payers would be irreparable, or such as could not be redressed by an action at law. If the levy of the tax be void, it will not protect the tax collector, nor will a sale under it divest the tax-payer of his property. The wrong can be fully compensated at law. It is not in any sense an irreparable injury, and no reason exists for transferring the jurisdiction over such cases from law to equity. Dean v. Todd, 22 Missouri, 90; Sayre v. Tomkins, 23 Missouri, 443; Lockwood v. City of St. Louis, 24 Missouri, 20, and the State v. Parkville and G. R. R. R. Co. et al., 32 Missouri, 496.

And in Massachusetts it has been held that equity has no jurisdiction to enjoin the collection of a tax, which the tax-payers allege to have been illegally assessed upon them. Until they have been compelled to pay such tax, they have suffered no wrong; and when they have paid it they can recover it back in an 'action at law, for money had and received to their use, which would furnish them an adequate and complete remedy. Brewer et al. v. City of Springfield, 97 Mass., 152.

It has been repeatedly held in California that the remedy by injunction will not lie to restrain the collection of taxes, except where the injury is irreparable. And that an averment of this character must be made in the bill, and if denied, must be sustained at the hearing. To give jurisdiction to a court of equity, it must be alleged and proved that the tax collector and his sureties would not be able to respond for the damages incurred by proceeding to collect the tax. The tax is no cloud upon the title of real estate, and its collection by distress or seizure of chattels is no more

than an ordinary trespass, if the tax be illegal, or the conduct of the tax collector unauthorized. Robinson et al. v. Gaar, 6 California, 273; DeWitt v. Hays, 2 Cal., 469; and Ritter v. Patch, 12 Cal., 298.

In the case of Munson v. Minor, 22 Illinois, 602, the court say, " that in the few cases that we have found, where relief was granted by a court of chancery, no question as to jurisdiction was raised. No rule is more familiar than that courts of equity will not interpose to give relief in cases where the party has a full and complete remedy at law, unless it be where the jurisdictions are concurrent. That in case of a levy of an illegal tax, a court of law has jurisdiction, there can be no doubt. If the directors had a legal right to levy the tax, they no doubt have the right to collect it, and if they were not vested with such a power, or if they failed to observe essential legal requirements in its exercise, it would be void, and if coerced by distress, they would be guilty of wrong for which a court of law would afford an adequate remedy."

If the assessment of taxes was vitiated by fraud, or the party assessed was likely to sustain an irreparable injury, equity might relieve. But mere irregularities in making an assessment will not be regarded in equity. McBride v. City of Chicago, 22 Illinois, 574; and the county of Cook et al. v. the Chicago, Burlington, and Quincy Railroad Company, 35 Ill., 460.

It has been decided in Rhode Island that a court of equity will not enjoin the collection of a tax on the mere ground that it has been improperly assessed against the tax-payer, and that his real estate has been levied upon, and is about to be sold for its payment. Nor will it give a remedy in such a case on the ground that a sale of the land would cast a cloud upon the title. That the cloud upon title, cast by a sale under a void tax, is too easily dispelled to occasion injury or even serious embarrassment, and the risk run by a person who deems himself illegally taxed if the sale is allowed to proceed, is too small, in comparison with the evils

of such interference, to justify a court of equity, without special grounds, in enjoining the sale ; and that there is no distinction in principle between the sale of personal and real estate. If the tax be really void, the title is not affected by the sale made to satisfy it, and if the tax-payer does not like to run the risk of its being void, he can pay it in relief of his land, and if successful in showing its invalidity, recover it back with interest in an action of *assumpsit.* Green v. Munford, 5 Rhode Island, 472.

In New York it seems to be well settled that an injunction will not be granted to restrain the collection of a tax on the bare ground that the assessment was illegal. There must be, in addition, facts bringing the case under some acknowledged appropriate head of equity jurisdiction. Susquehanna Bank v. the Board of Supervisors, 25 New York, 312; Insurance Co. v. New York, 33.Barbour, 322; and Wilson v. Mayor, 4 E. D. Smith, 675. And in the case of Messeck v. the Board of Supervisors of Columbia county, the court say, " that it has been repeatedly held that the powers of a court of equity cannot be successfully invoked to stay or prevent the assessment or collection of a tax. An injunction is an inappropriate remedy, as the plaintiff fails to state a case within any acknowledged head of equity jurisdiction. It is insisted that a multiplicity of suits will be prevented. The complaint does not charge that they are threatened ; and even if it did, that fact would not be sufficient to justify this remedy. There is not such a relation shown to exist between the plaintiff and other tax-payers as justifies an action in behalf of himself and others similarly situated. It must be an extreme case, indeed, which will justify an injunction to prevent a trespass. The policy of the law is decidedly opposed to the granting of an injunction to prevent the collection of taxes, as the wheels of government might thereby be stopped, and irreparable injury would be more likely to occur from a resort to that remedy than from a denial of it." 50 Barbour, 190.

If the principle contended for by the appellant's counsel

be adopted, chancery might restrain every threatened, unauthorized invasion of real or personal property. This would be to throw into chancery a great portion of all the torts committed or threatened. It would contravene public policy by throwing obstructions in the way of a speedy collection of the public revenue, and thereby seriously embarrass the government.

If bills of this kind are entertained, what will be the consequence? Constant applications will be made to courts of equity to enjoin collectors of taxes upon the ground of illegal assessments, at great expense, and with great vexation and delay, and to the great detriment of the government in a class of cases, which, without special equities, fall properly within the jurisdiction of another forum.

The decree of the court below is affirmed.

Tarbell, J.:

We have, for the first time under the present organization, a divided court. Impelled by more than ordinary desire to be right, I have given to the question involved in this case all the ability, seriousness and impartiality I possess. Referring to the opinion of the chief justice, I shall embody in as brief a space as consistent, the considerations which lead me to concur with him.

1st. The law as set forth by the chief justice is unanswerably and undeniably correct. Indeed, it has been, from the first, conceded, that as an original question, the want of jurisdiction in this case would admit of no discussion. From the organization of courts of equity, the rule has ever been, in England and in this country, without exception or qualification, that when there is adequate remedy at law, equity will not interpose.

2d. We have but recently adopted a new constitution, which separates law from equity courts, with judges and terms for each, and the legislature has defined their several powers and duties. We are entering, it is hoped, upon a new career of developement and progress, of rapid increase of

population and of diversified interests. Our system of revenue for the support of government has become, and must remain complicated at best; but with our school system and our increase of towns and cities the complications in the assessment of taxes are many times multiplied.

3d. With the rule stated by the majority are many exceptions, so that no case shall be without remedy. If these exceptions are not sufficiently numerous to include every possible case of merit, we will extend them, so that no instance of injustice shall exist without full, adequate and complete remedy, if not at law, then in equity. It is not intended to deny to any citizen that justice to which all are entitled. The rules adopted are those of nearly, if not in fact, every other state in the Union.

4th. The proposition in the case at bar is, in effect, to throw open the doors of chancery to the introduction and determination of all cases, indiscriminately, involving the levy and collection of taxes. Indeed, the proposition is, in words, to determine, " whether a right shall be litigated in one court rather than another." And it has been declared to be a question of forum only. We may not only, therefore, consider this proposition, according to its literal terms, but in its results, to-wit: to give to chancery exclusive jurisdiction, when taxes are involved, to increase the number irrespective of the character of cases, and undoubtedly to give to chancery in the end, many other cases of mere trespass, admittedly not now within its jurisdiction.

5th. To support the proposition in this case and its results, it is said, that the courts of equity in this state have hitherto entertained tax cases without objection, and upon this slender thread alone is based the claim put forth now for the first time, in fact, in Mississippi.

Such are the leading circumstances and surroundings which are to guide me in my conclusions.

1st. The tax cases before the war were extremely few. The laws and customs of the country were uniform and permanent. It mattered little, which forum was resorted to for

the very few cases of the kind. The very limited practice then, is entitled to little or no weight, in settling this question now. Great changes have taken place. Since the war, chancery has been a common receptacle for all classes of cases, almost regardless of jurisdiction. Every description of debtor, whether to the state for taxes, or to citizens for other causes, have found in equity a way to hinder and delay creditors. Injunctions were made easy by act of the legislature. With the impetus thus given, the tendency of litigants has been to transfer all cases to chancery. So palpable and general has been this tendency, that a check has for some time been an evident necessity to prevent the courts of equity from being clogged by cases not properly cognizable by them; and the consequent delay of meritorious issues.

2d. The practice prior to the war was so limited in extent and so different in circumstances, it can have no influence in the determination of the case at bar. But, under any circumstances, it is denied that jurisdiction can be acquired in this way. A rule of law or of practice may be thus established, but jurisdiction never. Cases involving jurisdiction, no objection being made, are often heard on their merits. They were in the high court of errors and appeals. They have been in this court. In New York, before the code, though tax cases were put upon the footing of all others, and were entertained only when there was no adequate remedy at law, yet, if the question of jurisdiction was waived, the courts of equity of that state heard and determined them on their merits. So in Ohio and so in Illinois, to whose decisions I shall refer directly.

3d. It is not uncommon to modify or reverse prior decisions, and it is the duty of the courts to do this, when the rule proves obnoxious, or when the practice leads to abuses. This court has modified and reversed former decisions, yet no complaint has been heard of such action.

4th. In the origin of the court of equity, its foundation was said to be, honesty, conscience and good faith. The rule was soon adopted as a principle of jurisdiction, that if the

matter were properly cognizable and relievable in any established court of ordinary jurisdiction, and no assistance was required from the court to effectuate a fair trial, the parties should be dismissed from the court of chancery to a court of common law, or other court of competent jurisdiction. Spence, vol. 1, p. 419; Warren's Law Studies, 416–420, and 423. This doctrine is thus more briefly stated : "It was a recognized general maxim, that the court of chancery should only hold jurisdiction of such matters as were not relievable by the common law." Ib. From the inception of a court of equity to the present moment, this principle of jurisdiction has remained unchanged, and unquestioned, until now, when, in effect, it is proposed to transfer to chancery, the determination of a whole class of cases, growing out of the revenue system of the state. I regard the proposition as revolutionary, destructive and dangerous, liable, not alone to overrun our chancery courts with cases not properly cognizable therein, but to the most gross abuses, not the least being the annihilation of one of the most ancient and revered doctrines of equity.

In Ohio, where tax cases have been heard on their merits, when, as in New York, the question of jurisdiction is waived, the supreme court of the state, as late as 1853, held, in a tax case, that a court of chancery will not interfere to prevent a mere trespass, and declared that " when the injury threatened would be irreparable, or where, from some peculiar circumstances connected with the parties or the transaction, complete redress cannot be had at law, a court of chancery is warranted in assuming jurisdiction."

This is the doctrine and practice in England, and in every state and of every adjudication in this country, both of the state and federal courts. There is not in this country or in England, a case sustaining the broad proposition now sought to be adopted in Mississippi. It is safe to say that in every instance in the United States, where equity has interposed to adjudicate questions pertaining to the assessment and collection of taxes, there have been, as in the case cited from

Ohio, some peculiar circumstances connected with the parties or the transaction, and that the broad doctrine now here for the first time insisted for, not only does not obtain anywhere, but is distinctly repudiated by every case entitled to be credited as authority, in the United States and in Great Britain.

5th. In Illinois, as in Mississippi, equity had, without objection, entertained tax cases, but as late as 1859, the supreme court of that state, in several cases, very emphatically stated its views of the sphere and jurisdiction of chancery. I quote from two:

" The main question involved in this case has been examined and considered by this court with all the care and diligence of which we are capable, and with a due sense of its importance, and the influence which our decision must have upon the rights and interests of the individual citizen and the public. We have, in this case, been called on to inquire in what cases the power of a court of chancery may be exercised, to restrain the collection of the revenue of the state. The decisions of this court show that in a large majority of the cases involving the regularity of the proceedings for the collection of the revenue, we have met with irregularities in the proceedings to such an extent as to destroy the titles to real estate acquired at tax sales. In this way, has a court of common law afforded a remedy for irregularities in the execution of the revenue laws. The same and even additional redress is afforded to parties whose personal property is seized for a tax illegally assessed. If, in all these cases, the court of chancery had taken the matter in hand, and examined the regularity of the proceedings wherever an attempt was made to collect the revenue, and restrained its collection, if it were shown that the law had not been complied with in the assessment of taxes, the result would have been that in many, if not most cases, the collection of the revenue would have been enjoined, and taxes would not have been collected.

Under such a system of the administration of the laws with so complicated a revenue system as ours, rendered so

by a tender regard for the rights and interests of the citizen, no government could exist for a single year. Let us now, by sustaining this bill, stretch out the strong arm of this court, and stay the hand of the collector in every case where any irregularity can be shown in the assessment of the revenues, and a flood of injunctions would be spread over the land at once. State and county revenue would cease to be collected, at least till the termination of protracted litigation and the wheels of government would stop. * * * * We must take things as they are, and look at practical results. * * * If the law can redress the wrong; if it can repair the injury, equity must suffer it, and let the courts of law redress it. This is the general rule, to which there are no doubt exceptions, and exceptions, too, in cases of the collection of taxes. * * * Indeed, we think a satisfactory answer to all these objections possible, but we choose to place our decision upon the broad ground of jurisdiction."

Chicago, B. and Q. R. Co. v. Frary et al., 22 Ill., 36.

"And it is believed that the cases are rare, even where the tax had been levied by persons having no pretence of legal authority to make such a levy, or in cases where the tax was not authorized by law, or where the warrant for its collection was void, that courts have interposed to stay its collection. In the few cases that we have found, where relief was granted, no question as to jurisdiction was raised. No rule is more familiar than that courts of equity will not interpose to give relief, in cases where the party has a full and complete remedy at law, unless it be where the jurisdictions are concurrent. That in case of a levy or an illegal tax, a court of law has jurisdiction, there can be no doubt. * * * If courts of equity were to entertain jurisdiction, and enjoin the collection of taxes in all cases in which mere informalities and irregularities have occurred in their assessment and levy, it would lead to great delay in the collection, and tend seriously to embarrass every department of the government, whether of state, county, town, or city, * * and would render the operation of the school system very

precarious ; while, if the party conceiving himself aggrieved, is left to his remedy at law, such inconveniences will not be felt.   And even if·we had the power to assume jurisdiction to grant relief, when we see that its exercise would probably lead to such embarrassments in the finances of these various departments of our municipality, we should hesitate long, before assuming the exercise of such a power.   But we conceive that a court of equity is vested with no such authority." Munson v. Minor, ib., 601.

6th. Under all these circumstances, and in view of the unquestioned and undoubted law of the case, the rule adopted by us is, to my mind, without a doubt, right in principle and in policy.   To announce the opposite rule would be in its results to throw wide open the doors of chancery to a class of cases, as a class.   It would be like opening the flood gates of the pent-up stream.   We could retrace only by direct reversal, but then, not without long endurance of abuses, sure to follow.

By the doctrine we have declared, with its exceptions, we hold a check on apprehended abuses, while we entertain all cases surrounded by those "peculiar circumstances," as to parties or transactions, which address themselves to the conscience of a court of equity, and are without full and complete remedy at law.   And not only so, but if· our position leaves any without redress, we can and will extend the beneficent doctrines of equity, so as to embrace them.

7th. Defeated suitors often complain of courts or counsel, but such complaints, no more than the few tax cases before the war, and the irregular practice since, can be allowed to overturn a principle established by every country, and by every adjudication, where law is regularly administered, since the existence of a court of equity.

8th. In view of cotemporaneous history, I shall take the liberty of departing slightly from the usual course of judicial opinions, by saying that, while giving the law to be accepted and followed, I, at the same time, not only invite the verdict of history, but the judgment of the disinterested, learned

and impartial of the profession, upon the law as expounded by the chief justice in this case. I have sought only to know the law and the right, and to establish both on a basis which shall be respected under all the changes to which our institutions are liable. The conclusions reached, are not only judicially correct, but as a matter of policy the best for all—the law in this instance and the interests of the state uniting and leading to one result.

The summary of the argument is this: That in not one of the United States is there any statutory regulation as to the jurisdiction of chancery over tax cases, nor any state whose courts recognize any special equity jurisdiction over such cases, independent of those peculiar circumstances which confer jurisdiction; that we have followed the adjudications of other states; that the revenue system of those states commands general acquiescence, because its disturbance falls at last in its injurious effects upon the people, nor is there for the same reason, a disposition to embarrass tax collectors for ulterior purposes; that by mutual forbearance and good will and by the selection of competent officials, and a proper watch over their conduct, the rules which have worked harmoniously elsewhere, will be successfully and satisfactorily administered here; but that, even in the event of factious opposition, which is not anticipated, they are believed to be best calculated to evolve a sound, just, and healthy result, as in other states.

In concurring with the chief justice fully and cordially, as I do, I will add, that I am more perfectly satisfied with this result, with every additional day's reflection and discussion.

We overturn no fixed rule, we reverse no established doctrine; but with the new organization of our courts we direct causes into appropriate channels, by the observance and enforcement of the laws and usages of the respective courts established by and under our new constiution.

SIMRALL, J., *dissenting :*

I am constrained to dissent from some of the views

announced by the majority of the court, as to the jurisdiction of the chancery court to entertain a bill of injunction. I plant myself on what has been, as I understand, the uniform, unbroken practice in this state, as far back as our judicial records extend, unquestioned and unchallenged until now. The habit of the bar, perhaps from the first organization of the state government, to bring these suits in equity ; the usage of the judges, circuit and appellate, and of the chancellors, to grant the injunction, to adjudicate the cases upon their merits, is to my mind as conclusive in favor of the jurisdiction as a direct adjudication of the supreme court. I am not able to conceive or state a clearer evidence of the right of equity cognizance over a particular subject, than that the bar have been accustomed to bring the subject before the court; and the court, time and again, has adjudicated upon it. Every additional adjudication is a fresh assertion of the power of the court over the subject, and a cumulative assurance to suitors, with confidence, to bring their plaints before that tribunal. It is no answer to say that the jurisdictional question has been now raised for the first time. The chancery bar of this state, for thirty years and more, has been eminent for talent and learning ; and it is not to be supposed that a usurpation, as this is now claimed to be, should have crept in unnoticed and unawares. Besides, every motion to dissolve, and demurrer to the bill, bring directly to the judicial mind the question of the equitable right to interpose. Hardly a tax case can be found, either in the courts of original or appellate jurisdiction, where this point was not raised on the record. The community look to this court for the true and permanent exposition of the law.

If we vacillate; if we overturn the usages of practice ; if we unsettle what the bar and the public have been induced to believe was assured and permanent, we extend an invitation to suitors to embark on speculative adventures, and to count the chances of successful results. The judges should ever remember that if they shall expect their decisions to be accepted as declaratory of the law, they should not, except

for the most mighty and commanding reasons, depart from what has been handed down to them in the practice of their predecessors. It is but little less important that the utterances of this court, as the ultimate expositor of the law, should be uniform and consistent, than that they should be right. Perhaps, nothing so tends to shake public confidence, to impair the usefulness of the legal tribunals and bring them into disrepute, as the imputation of vacillation in their decisions. It gives force and point to the sarcasm about their "uncertainty." Nor is the reason or necessity, in this instance, of departing from the old and accustomed paths realized. It is simply a question whether a "right" shall be litigated in one court rather than another. No mischiefs, serious or otherwise, can result from adhering to the old practice.

I proceed now to refer to the cases that have been brought to this court, or rather to some of them, to show that the jurisdiction has been so long and so often exerted that it ought not now to be considered open to cavil or doubt. The Bank of United States v. State of Mississippi et al., 12 S. & M., 457 (in 1849), was a bill enjoining taxes. Such, also, was Body v. Tuqua et al., 24 Miss. Rep., 498 (in 1862); Williams v. Cammack, 27 Miss. Rep., 223 (1854); Alcorn v. Hamer, 38 Miss. Rep., 745 (1860).

There were other cases unreported—Newman v. Robertson (two cases); Same v. Peale (two cases). Also O'Donnell v. Baily et al., 24 Miss. Rep., 387 (1852). The court, in Anderson v. the State, 23 Miss. Rep., 474, in referring to the jurisdictional point, quote the case of Osborne v. Bank, 9 Wheat, 738, as authority. O'Donnell v. Bailey et al., 24 Miss. Rep., 1852, was an injunction against a threatened sale for taxes.

An analysis of these numerous cases, will show that in some of them, the taxes were chargeable on lands—in others, on personal effects; in some of them, imposed for local objects, and by local authority; in some, the collector was actually proceeding to enforce payment by sale—in others, he was about to proceed, or threatened to do so. Some of these

Simrall, J., dissenting.

cases were brought into this court on demurrer to the bill—
others on motions to dissolve the injunctions; others again
from the hearing final.   Some of them contested the legality
of the tax for want of authority to impose and collect it;
others, for an improper assessment.   If the records of the
superior court of chancery, of the several vice-chancery
courts, and the chancery courts of the various counties, were
searched for the last thirty years, the assertion is ventured,
that a vast multitude of these injunction suits would be found,
where the "right" of parties was litigated and decided.
Two cases, as late as 1869, Read v. Beal, sheriff and tax col-
lector, 42 Miss. Rep., and O'Hara v. Cox, were most elaborately
argued at the bar, and lengthy opinions delivered by the
court, and not a doubt was hinted that the bill of injunction
was the appropriate remedy.   I am confident, therefore, in
the opinion, that this court transcends its official duty, in the
presence of this long practice, this great weight of authority,
in *now* entertaining the question of jurisdiction, and taking
by surprise, a great number of suitors who have brought their
cases here, through the chancery courts.   There are, perhaps
now pending on the docket of this court, fifteen or twenty
tax cases, from every quarter of the state, every one of which
were brought in the chancery court.

   The legislative opinion concurs with the professional and
judicial, on this subject.    Hence we find the legislature, as
late as the 9th of July last (1870), in the revenue bill, regu-
lating, in some particulars, suits enjoining taxes.   Sec. 22, p.
37, of acts, declares "All causes which may hereafter be
commenced, in which it is sought to enjoin or delay the col-
lection of taxes imposed by competent authority, shall be
regarded as preference cases, and upon the dissolution of the
injunction, 10 per cent. damages on amount of taxes, shall
be imposed.   Suit by injunction is here distinctly recognized
as a known, usual, and accustomed remedy.   The act proposes
to guard the revenue from delay in collection, by the inter-
position of an untenable or frivolous injunction, under a
penalty.   It is declaratory, by the law-making department

of the government, that this form of remedy does exist, and it arms the court with additional power to protect the public revenue.

I should be the better reconciled to the conclusion attained by the majority of the court, if the jurisdiction so long exerted and acquiesced in here was purely exceptional, and had no support elsewhere.

Mr. Eden, after enumerating a great number of circumstances in which the injunction is proper, adds : "It would be difficult to enumerate them all, for in the endless variety of cases in which a plaintiff is entitled to relief, if that act consists in restraining the commission or a continuance of some act of the defendant, the court administers it by means of the writ of injunction." Sanover et al. v. Justices of Sup. Court, was the injunction of the tax for public buildings, imposed by the inferior court of Terrell county, Georgia. In reply to the objection made to the jurisdiction, Lamkin J., for the court, said : " We approve the remedy resorted to in this case. It is not only more complete than any other, but the only one which meets the exigencies of the case." 27 Geo. Rep., 357. The question was made in Miller v. Gorman, 38 Penn. Rep., 313. In their reasoning, the court intimate that the enforcement of taxes is by *quasi* judicial means, and that injunction to restrain proceedings at law, is one of the most common heads of equity jurisdiction. If the remedy at law is adequate, injunction will not be granted. " It may be said damages may be recovered against the supervisor; but it will lie only after payment of the tax, and why should equity permit a plain breach of statute duty, in order that it might be redressed at law ? One great purpose of equity jurisdiction, is to prevent circuity of actions, and unnecessary litigation."

In Boyce exrs. v. Grundy, 3 Peters Rep., 210, it was said, and repeated in Watson v. Sutherland, 7 Wallace, 78 : " It is not enough that there is a remedy at law; it must be plain and adequate, as practical and efficient to the ends of justice, and its prompt administration, as the remedy in equity."

In Commonwealth *ex relatione*, Raule v. Supervisors, *mandamus* was refused, because the relator had an ample remedy by injunction, to restrain collection of tax and sale of the property. In Covegill v. Long, 15 Ill. R., 202; Shirley v. Salin, 20 Ill., 357; Ottawa v. Walker et al., 21 Ill., 610, injunction was conceded to be a proper remedy, if the tax is not authorized by law. But where irregularities occur in the acts of the collector or assessor, parties will be left to suit at law. In New Hampshire, 1 Foster, 87, injunction was sustained restraining the town from collecting a tax for a purpose not authorized. In Ohio, Burnett v. Cincinnati, 3 Ohio Rep., 73, the question underwent a full examination, at the argument, and by the court. After presenting various considerations in favor of the jurisdiction, the court concluded: " We think it stands upon the general principles that govern the court, with respect to which no other adequate remedy can be extended." In response to suggestions made at the argument, that the collection of revenue might be interfered with, the court say: " Such considerations furnish no reason why the court should not interpose. The application is addressed to the sound discretion of the court, and there is no reason to apprehend that it will be allowed on trivial grounds. The case of Osborne v. Bank of U. S., 9 Wheat., 738, is a case directly in point for enjoining taxes." In the later case of Cullertson v. Cincinnati, 16 Ohio Rep., 577, the injunction was sustained, because the taxes were not assessed in accordance with city ordinances. The courts in Wisconsin hold that chancery will not enjoin a tax legal and just, for the errors or irregularities of the ministerial officers. Such was 11 Wisconsin Rep., 497, and cases there cited. In 25 Conn., 238, the injunction was denied, because the warrant for collection was confined to personal property; but the intimation is quite distinct that it would be otherwise if the taxes affected real estate. Indeed, the authorities so far as I have examined them, are quite uniform, that taxes may be enjoined, which bind real estate; for thereby a cloud is incepted to be cast on the title. The case in 30 Penn.,

227, agrees with the others in that court. The injunction here was refused, because the party or his privy had already tried the question by appeal to the court of common pleas, whose decision was final.

The supreme court of Pennsylvania, in a case quoted, treat the assessment and collection of taxes as *quasi* judicial proceedings. In Griffin v. Mixon, 38 Miss. Rep., 424, it is expressly declared that the assessment and collection by sale, is both judicial and executive, or ministerial; that the machinery of assessing and making out the lists of taxes, are essentially judicial, and in nature of judgment, and if not so there could be no power of sale conferred on the officer. Therefore, the court held the act of 1850, which forfeited lands to the state for non-payment of taxes as unconstitutional and void; because, it was depriving a party of property " without due course of law." On the ground, then, of enjoining proceedings at law, in order that the plaintiff may be let in to make a defense, which he has had no opportunity to make, the party would stand upon a well established equitable principle.

Perhaps the most potent reason for the injunction in the Wheeling Bridge case, 13 How. U. S. S. C. Rep., was that the wrong complained of was continuous, and would be ever recurring, that suits for redress at law will be very numerous. Do not the revenue laws fall within the same reason? Generally the taxes are imposed without limit as to time. If illegal or wrongful, it partakes of perpituity, and the injury does not terminate with a single collection but may continue from year to year. It was this view of the subject, in Wood v. Dodge, 6 McLean, 146, that weighed heavily with Justice McLean. It is very worthy of observation, that this decision was made by that eminent judge after the cases in the supreme court of the United States, quoted by the majority of the court in their opinion, and in which he took part. He places the equity on two grounds: first, that the collection of the tax was to be annually repeated; second, the remedy at law to recover the money back is not adequate. It is sub-

ject to delay, and the contingent solvency of those to whom it may be paid. A continued repetition of a wrongful act, under color of authority, is of itself ground for this preventive remedy. It prevents the harassment and expense of a multiplicity of suits. In Paine v. Wright and Ind. & Bef. R. R. Co., 6 McLean Rep. (in 1855), the equity of the bill was that an illegal tax had been imposed injurious to the stockholders, and on this ground they ask relief. In Woolsey v. Dodge, *supra*, speaking of this matter of the continuousness of the tax in reference to its unlawful assessment and collection, the learned judge uses this emphatic language: "And this trespass is to be repeated annually!" What a spectacle for a law-abiding people! What stronger grounds than this for an injunction?"

It has been the uniform practice of the legislature to impose taxes without limit as to time; taking the chapter of the Rev. Code as illustrating the fact. The 10th article of section 3, page 72, is as follows: "For the support of the government of this state the following taxes shall be assessed and collected: Sixteen cents on the taxable value of all lands," and so on with all the subjects of taxation. The tax on land is a charge superior to all other liens. Taxes unpaid on the 1st day of April shall be enforced by distress and sale. Subsequent revenue laws, passed from time to time, are but amendatory of this; and all of them contain the feature that the tax imposed continues from year to year, and does not expire by a limited time. The act of December 5, 1865, under which most of the cases pending in this court arose, has distinctly this characteristic. The first section is: "The following taxes shall be assessed, levied and collected, to-wit: Ten cents on each one hundred dollars' value of real estate." Then follows the rate imposed on the several subjects. The second section, page 222: "on each and every license granted to retail vinous or spirituous liquors," etc., etc., naming the rate. This tax, and all others, are due on the 1st of April, and collected from year to year, by distress and sale as provided in the Code. They are continuous. Of

this character is also the last revenue act, of July, 1870; so that this perpetuity of taxes from year to year, is a fixed feature of our state financial system, and brings the case within the rule laid down in the Wheeling Bridge case, which is a familiar and an undisputed ground for injunction.

Thompson v. Pacific R. R. Co., 9 Wallace, 581, was the last case in the supreme court of the United States on this subject. The sole question made by the bill was, whether certain taxes imposed by the State of Kansas on the railroad were legal. A preliminary injunction had been granted. The case was argued by able counsel on both sides, and it was not questioned that chancery was the proper forum.

This review might be extended to much greater length. This much will suffice to show that the jurisdiction which is now for the first time to be denied here, has been exerted in many of the states, and in the courts of the United States; exerted too, after the fullest argument and maturest consideration. Exerted not by virtue of statutes, but on the ordinary principles which govern the court. I have not made the examination for the purpose of showing, that upon the weight of authority, we have been right in this state. I take leave of the subject, however, impressed with the conviction that it is the most beneficial, adequate, and expedious mode of litigating the subject. All the cases concur, that if the collector enforces the collection, where the taxpayer is not bound by law to pay, he is personally liable in trespass, or for money had and received. The question of right can hardly be tried at law, until he has collected in half or all the taxes. He subjects himself to as many suits as he has made collections. It is no defense that he has paid the money over to the county or state. The county or state ought to hold him harmless, but there is no legal mode of enforcing a re-payment from the state. With all these embarrassments, multiplicity of suits; to my mind it seems clear, that the complete remedy is to test the right in advance by bill in chancery. It is doubtless, for some or all these rea-

sons that, with the unbroken appropriation of the bar and the bench, and the legislature, the chancery court has from the beginning, been resorted to for relief. Supported as the jurisdiction has been, by so many and cogent reasons, such conclusive authority here, and sustained by so much elsewhere, whatever my own opinion might be, if it were a new and original question, I should not feel myself at liberty to entertain an individual opinion; but would content myself with accepting the law as it had come down to me, and so transmit it to my successors. The majority of the court, denying the jurisdiction of the chancery court, I forbear to discuss the other questions in the case.